UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Belsito Communications, Inc.
d/b/a 1st Responder Newspaper
and Brian K. Blackden,
    Plaintiffs

    v.                                    Case No. 10-cv-450-SM
                                          Opinion No. 2015 DNH 009
New Hampshire State Trooper
James Decker,
    Defendant


**O R D E R**


    Since approximately 2007, Brian Blackden has been a part-
time freelance photographer.  During that period of time, he has
submitted photographs to a number of regional media outlets,
including Belsito Communications, publisher of a website and
newspaper called "1st Responder News."  Together, Blackden and
Belsito Communications bring this action against New Hampshire
State Trooper James Decker, claiming that Trooper Decker violated
their constitutionally protected rights.  See generally 42 U.S.C.
§ 1983.


    Trooper Decker moves for summary judgment, asserting that
there are no genuinely disputed material facts and saying he is
entitled to judgment as a matter of law.  Plaintiffs object.  For
the reasons discussed, Trooper Decker's motion is granted.

**Standard of Review**

When ruling on a motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).  Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Int'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

**Background**

Several years ago, Blackden briefly worked as a firefighter/EMT for the towns of Kingston and Newton, New Hampshire.  He has not, however, ever been licensed or certified as a firefighter by the State of New Hampshire, nor has he ever taken any firefighting training at the state fire academy. Blackden Deposition (document no. 44-27) at 36.  Beginning in about 2007, Blackden became a part-time freelance photographer. Over the years, he has submitted photographs to a number of

regional news outlets, including Belsito Communications, a publisher of both online and print media including "1st Responder News."  Joseph Belsito, president and sole owner of Belsito Communications, described "1st Responder News" as a "niche publication that is delivered to the emergency services community . . . . that reports on local news and incidents within the states that it serves."  Belsito Deposition (document no. 44-32) at 9.

In 2009 or 2010, Blackden purchased a vehicle formerly used as an ambulance by the Town of Derry.  Blackden Deposition at 137-38.  He modified the vehicle only slightly (to accommodate some of his equipment), but he did remove the red lenses from the front of the vehicle, and replaced them with yellow or amber lenses.  Id. at 138.  He did not, however, remove the red lenses from the four lights at the rear of the ambulance.  So, other than a sign above the license plate that read "Fire Department Photographer," the rear of the vehicle appeared as it had when it was in use as an ambulance.  Id. at 141-42.  Blackden also maintained a portable radio that was tuned to "all the fire department radio bands for basically the lower half of the state and one was a business band radio that certain people in this area use to communicate."  Id. at 142.

Blackden testified that in the early morning of August 25, 2010, he was awakened by an alert tone on his radio, indicating that there had been an automobile accident on Route 93.  Id. at 148.  Blackden got up and drove his re-purposed ambulance to the scene.  When he arrived, he parked on the right side of the highway, at the edge of the pavement.  The vehicle that had been involved in the accident was to Blackden's left, in the median strip.  At that point, "different rescue vehicles started showing up and [he] put on [his] gear, walked across the street, stood in front of the Penacook Rescue vehicle, and just started taking pictures of the scene."  Id. at 151.  Blackden's "gear" included a black firefighter's "turnout coat" with yellow and white reflective bands, and a black firefighter's helmet, on which Blackden had affixed the word "Photographer."  See Id. at 111-12, 116, 151, and 172.  Blackden's attire plainly created some confusion on the part of emergency responders at the scene.  For example, the Canterbury Fire Chief testified that Blackden "blended in so well with our rescue crew that I didn't know who he was at first.  He looked like he was one of Penacook Rescue's crew."  Affidavit of Chief Peter Angwin (document no. 44-17) at para. 7.  See also Id. at para. 10 ("He stated that he was with Penacook or something about Penacook Rescue.  I thought he said he was with Penacook Rescue.").

4

At some point, Chief Angwin approached Blackden and asked if he owned the vehicle parked on the right side of the highway. Blackden told him he did.  Because he was concerned that the location of Blackden's vehicle posed a potential safety hazard, the Chief asked him to move it to the same side of the highway as the rescue vehicles.  Blackden complied and drove his re-purposed ambulance to the left side of the highway, and pulled up behind a Concord fire truck.  Blackden Deposition at 160.  As he left the vehicle, Blackden activated the red "wig-wag" lights on the top rear of the vehicle.  He also activated yellow "arrow" lights, as well as the vehicle's emergency (brake light) flashers.  Id. at 162.

As a freelance photographer, Blackden had been on the scene of several automobile accidents and fire emergencies.  He was, therefore, aware of the fact that he should not interfere with the emergency responders or intrude into the "working scene." Id. at 158.  So, he typically tried to remain "outside the perimeter" of any accident scene he was photographing, and testified that it's "pretty easy to tell from the way the [emergency] vehicles are parked" where that perimeter has been defined.  "As long as you're on the far side of [the emergency vehicles], that's the outside of the scene." Id. at 159.  See also Affidavit of Peter Angwin at para. 15 ("It is common for an

incident scene to be delineated by the presence of fire and
emergency vehicles.  These vehicles are often used as
obstructions to prevent unauthorized access to an incident scene.
When responding to incidents on the highways, it is our protocol
to set up a safety zone by placing a fire engine or other
apparatus approximately one hundred and fifty (150) feet away
from the incident on the same side of the highway.").

So, while he may have parked his vehicle "outside the
scene," (i.e., immediately behind the Concord fire truck),
Blackden plainly entered (and remained inside) that perimeter
while he was taking photographs.  See, e.g. Blackden Deposition
at 151 ("I put on my gear, walked across the street, stood in
front of the Penacook Rescue vehicle and just started taking
pictures."); 156 (same).  Chief Angwin testified as follows:

> I saw Blackden take a couple of pictures.  He was
> approximately thirty-five feet from the vehicle.
> Ordinarily, I would not have allowed a member of the
> press or media to get that close to the vehicle.  On
> the day of the incident, if Blackden was dressed in a
> shirt and a tie, I would have had him removed from the
> scene.  Blackden was able to get that close to the
> vehicle because of the gear that he had on and because
> of what he had previously said to me [that is,
> something about being "with Penacook"].
>
> Blackden did not have authority to be on the scene.

Affidavit of Peter Angwin at paras. 11 and 12.

Shortly after he moved his vehicle, Blackden learned that the driver of the automobile involved in the accident had died. He approached Chief Angwin and asked whether he wanted Blackden to take "extraction photos."  Blackden Deposition at 161.  After the Chief responded "no," Blackden turned around, began walking back to his vehicle, and was confronted by Trooper Decker.

Trooper Decker had arrived at the accident scene at approximately 6:00 am, at which point he saw an "ambulance-like" vehicle parked at the rear of the scene, with its red lights activated in a "wig-wag" or alternating fashion.  See Affidavit in Support of Search Warrant, Exhibit 1 to Decker Affidavit, (document no. 44-22) at para. 4.  Trooper Decker further testified as follows:

> Mr. Blackden was observed on scene as well [as personnel from Canterbury and Penacook Fire and Rescue].  He was attired in "turn out" gear: A protective firefighting coat and firefighter's helmet. Additionally, he had a radio/scanner slung across his chest.  He was also holding a full-sized digital camera.  At the time he was first observed, Blackden was walking away from the crash scene, but still within the active scene.
>
> * * *
>
> Upon being questioned, Blackden identified himself as being "with Penacook Rescue."  He further stated that he was "toned out to the scene by Penacook Rescue." Blackden asserted that he was there to photograph the scene on behalf of Penacook Rescue, and that he was trying to get "extraction photos."

7

Id. at paras. 9, 10.  After determining that Blackden was not a
member of the rescue team from either Canterbury or Penacook,
Trooper Decker questioned Blackden about his presence at the
scene.  And, having been told by Blackden that he was "with
Penacook Rescue," Trooper Decker asked Blackden for his
credentials.  See, e.g., Decker Deposition at 33.  According to
Decker, Blackden said that he "left them at home."  Id.


     Trooper Decker testified that whenever there is a fatal
automobile accident, a responding State Police Trooper must
contact both the Medical Examiner's Office and the County
Attorney's Office (to notify the County Attorney whether there
may be a criminal aspect to the incident).  Because someone at
State Police Dispatch had already contacted the Medical
Examiner's Office, Trooper Decker called the County Attorney's
Office.  He spoke with an Assistant County Attorney, advised her
of the automobile crash and single fatality, and expressed his
opinion that, given the circumstances, the driver had probably
fallen asleep at the wheel.  He then informed her that:

> [T]here was a subject on scene who was dressed in
> emergency turnout gear who had driven a surplus
> ambulance with active emergency lights to this scene
> and parked that vehicle on a restricted access highway
> in and amongst the other emergency vehicles and had
> gotten out and was in the scene taking photographs.

Decker Deposition at 37.

Trooper Decker informed the Assistant County Attorney that he was contemplating seizing Blackden's camera as evidence of criminal conduct, and sought her opinion.  According to Trooper Decker, he had "reason to believe that Blackden had committed a number of crimes including impersonation of emergency rescue personnel, reckless conduct, unlawful stopping/standing/parking on a restricted access highway, unlawful entry into an emergency scene, and unauthorized use of emergency lights."  Decker Affidavit (document no. 44-21) at paras. 4-5.  He also testified that the Assistant County Attorney approved of the seizure of Blackden's camera.  <u>Id.</u> at 37.  Shortly thereafter, Trooper Decker seized Blackden's digital camera, believing it contained evidence of potential criminal conduct which could easily be destroyed.  <u>Id.</u> at 44.  He did not, however, seize Blackden's turnout gear, scanner/radio, or the re-purposed ambulance.  Nor did he arrest Blackden at that time.

At his deposition, Trooper Decker testified about why he decided to seize Blackden's camera as evidence of, among other things, impersonating an emergency service provider.

> [The photos] put him in the scene.  Impersonation is going to be contextual.  It's a contextual offense.  If Mr. Blackden chooses to dress as a firefighter for Halloween and goes to a costume party, nobody's going to charge him with impersonation.

> If Mr. Blackden dresses as a firefighter and drives a
> surplus ambulance to a fatal crash scene, gets out,
> takes photos which can only be taken from certain
> points of view [i.e., within the confines of the
> accident scene], okay, and then says on three different
> occasions he's "with Penacook Rescue," contextually
> that's impersonation.

Decker Deposition at 45.  He explained that he was most concerned
about the photographs on Blackden's camera because they, unlike
Blackden's turnout gear, radio, and ambulance, could easily be
destroyed or erased.  Id. at 44.  See also Decker Affidavit at
para. 6.  And, those photos (as well as the metadata recorded
with them) could provide evidence of Blackden's unauthorized
presence within the accident scene.

As part of his investigation, Trooper Decker contacted Chief
Angwin of Canterbury Fire and Rescue, Chief Oberman of Penacook
Rescue, and Assistant Chief Brechtel of Penacook Rescue, all of
whom confirmed that Blackden was not a member of their squads and
had not received permission to be on the scene of the accident.
See Affidavit of James C. Decker (document no. 44-23) at paras.
18-22.  Decker also performed a record check and determined that
Blackden had never been licensed as a firefighter and, although
he once held an EMT license, it had expired in 1987.  Decker
Affidavit, Exhibit 1, at para. 17.

The following day, Trooper Decker sought and obtained a
search warrant from a Concord District Court Judge authorizing
him to search the digital images on Blackden's camera.
Blackden's camera was returned to him the next day.  Pursuant to
state law, however, the memory card was retained as evidence of
Blackden's alleged unlawful conduct.  See generally N.H. Rev.
Stat. Ann. ("RSA") 595-A:6 ("If an officer in the execution of a
search warrant, or by some other authorized method, finds
property or articles he is empowered to take, he shall seize and
safely keep them under the direction of the court or justice so
long as necessary to permit them to be produced or used as
evidence in any trial.").  Parenthetically, the court notes that
Blackden's memory card was eventually released to his attorney,
with the understanding that she would retain it (in an unaltered
state) until the charges against her client had been resolved.

Blackden was subsequently charged with the following:
unlawfully displaying red emergency lights on his re-purposed
ambulance, in violation of RSA 266:78-c; unlawfully entering a
controlled emergency scene, in violation of the Uniform Fire
Code, § 1.8.5; purposely impersonating emergency medical
personnel, in violation of RSA 153-A:21; and obstruction of
government administration, in violation of RSA 642:1.  See

Complaint, Exhibit 3 to Decker Affidavit (document no. 44-24).
In November of 2010, a warrant was issued for Blackden's arrest.

Although the procedural history of the criminal case against
Blackden, as well as the charges actually pursued against him,
are convoluted, it appears that he was convicted in the state
district court of both impersonating emergency medical personnel
and unlawful display of red lights.  See Affidavit of Penny Dean,
Esq. (document no. 34-1) at para. 7.  It seems that Blackden
appealed only the more serious of those convictions (i.e.,
impersonating emergency personnel) to the state superior court
where, pursuant to New Hampshire law, he sought a trial de novo.[1]

Although Blackden requested a jury trial, the superior court
denied that request and Blackden was, again, convicted of
impersonating an emergency service provider.  He appealed that
conviction to the New Hampshire Supreme Court, which concluded he
was improperly denied his right to a jury trial.  Accordingly,
the court vacated Blackden's impersonation conviction and
remanded the matter for re-trial.  See State v. Blackden
(document no. 35-1).  On remand, the State nolle prossed the

---

[1]     At oral argument, Attorney Dean, counsel for Blackden,
clarified this point, noting that Blackden did not appeal his
conviction for the red light violation and telling the court,
"No, that's a valid conviction and it's the only conviction of
his."

complaint against Blackden and filed an information charging him
with violating the then recently-revised version of RSA 153-A:21,
which now prohibits unauthorized operation of an emergency
services vehicle.  He was acquitted of that charge.  As noted
above, however, it appears that his conviction for unlawfully
displaying red emergency lights on his vehicle remained
unaffected.

In their two-count amended complaint, plaintiffs allege
that: (1) Trooper Decker's warrantless seizure of Blackden's
digital camera and memory card violated Blackden's Fourth
Amendment rights; and (2) Trooper Decker's unlawful conduct
prevented Blackden from exercising his First Amendment right to
publish photographs of the accident scene and amounted to an
unconstitutional "prior restraint" on Blackden's speech.  The
claims advanced by Belsito Communications are entirely derivative
of Blackden's: Belsito asserts that, by unlawfully seizing
Blackden's memory card, Trooper Decker infringed upon its own
constitutionally protected right to publish the accident scene
photographs that Blackden had taken.

**Discussion**

I.   <u>Belsito Communications Lacks Standing</u>.

Largely for the reasons set forth in defendant's memoranda, Belsito Communications lacks standing to pursue First and Fourth Amendment claims against Trooper Decker for his conduct on the morning of August 25, 2010.  <u>See generally</u> <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-62 (1992) (discussing the three elements of constitutional standing and noting that the party invoking federal jurisdiction bears the burden of establishing that it has standing).  <u>See also</u> <u>Donahue v. City of Boston</u>, 304 F.3d 110, 115-16 (1st Cir. 2002).  Among other things, Belsito has failed to demonstrate that Trooper Decker seized any of its property, nor has it shown any cognizable interest in the contents of Blackden's memory card (other than an entirely speculative claim that if it had been given a timely opportunity to review Blackden's photographs, it may – or may not – have exercised its discretion to publish them).  In short, Belsito Communication's claims are too remote to vest it with standing in this action.

But, the standing issue does not require a detailed discussion.  As noted, even if Belsito could establish legal standing, its claims are entirely derivative of Blackden's.

14

And, because Blackden's constitutional claims fall short on the merits, so too would Belsito's.

II.  Fourth Amendment - Warrantless Seizure of Blackden's Camera.

Plaintiffs assert that, "Decker's seizure of Blackden's camera and digital photo card was without justification, probable cause or other legal process . . . . [and such conduct] violated, and continues to violate, Blackden's Fourth Amendment rights against the seizure and retention of his property without probable cause."  Amended Complaint at paras. 34-35.  The court disagrees.

The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures in the absence of a warrant supported by probable cause.  See, e.g., United States v. White, 804 F.3d 132, 136 (1st Cir. 2015).  Typically, then, a police officer may not seize personal property - like a camera - absent a warrant.  See, e.g., United States v. Place, 462 U.S. 696, 701 (1983) ("In the ordinary case, the Court has viewed a seizure of personal property as per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized.").  Here, plaintiffs challenge both Trooper Decker's determination that there was probable cause

15

to believe that Blackden had violated the law, and his decision to seize Blackden's camera as evidence of that unlawful conduct, in the absence of a warrant.

    A.    Probable Cause.

Probable cause exists when the facts and circumstances within an officer's knowledge and of which he or she had reasonably trustworthy information were sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense.  See Beck v. Ohio, 379 U.S. 89, 91 (1964). Probable cause "does not require evidence to prove guilt beyond a reasonable doubt. . . . Probability is the touchstone.  The probable cause standard does not require the officers' conclusion to be ironclad, or even highly probable.  Their conclusion that probable cause exists need only be reasonable."  Forest v. Pawtucket Police Dep't, 377 F.3d 52, 56 (1st Cir. 2004) (citations and internal punctuation omitted).


As the record amply demonstrates, the existence of probable cause in this case is not a close question.  On the morning of August 25, 2010, Trooper Decker unarguably had probable cause to believe that Blackden had violated several state laws, including those prohibiting the unlawful display of red emergency lights, the impersonation of emergency medical personnel, and the

unauthorized entry into a controlled emergency scene.  See RSA
153-A:21; RSA 154:7 II; and RSA 266:78-c.  See also Uniform Fire
Code NFPA, § 1.8.5 ("Persons, except as authorized by the
incident commander in charge of the emergency, shall not be
permitted" to access a defined accident scene); N.H. Saf-C 6001
(adopting the NFPA Uniform Fire Code).  Trooper Decker also had
probable cause to believe that Blackden's camera contained
evidence of Blackden's unlawful conduct - that is, the
photographs and related metadata could prove that Blackden was
within the restricted area near the accident, without
authorization.  That, in turn, supported the charge that Blackden
was impersonating an emergency medical service provider.


     B.   Warrantless Seizure of the Camera.

     There are, of course, exceptions to the Fourth Amendment's
warrant requirement.  One such exception applies in this case.
Warrantless searches and seizures can be justified by "exigent
circumstances," which are typically exemplified by "hot pursuit
of a felon, imminent destruction or removal of evidence, the
threatened escape by a suspect, or imminent threat to the life or
safety of the public [or] police officers."  Bilida v. McCleod,
211 F.3d 166, 171 (1st Cir. 2000) (emphasis supplied).  As the
Supreme Court has explained:

> Where law enforcement authorities have probable cause
> to believe that a container holds contraband or
> evidence of a crime, but have not secured a warrant,
> the Court has interpreted the Amendment to permit
> seizure of the property, pending issuance of a warrant
> to examine its contents, if the exigencies of the
> circumstances demand it or some other recognized
> exception to the warrant requirement is present.

Place, 462 U.S. at 701 (citations omitted).

Here, Trooper Decker's actions were entirely consistent with the Fourth Amendment. He reasonably and supportably concluded that there was probable cause to believe Blackden's camera contained evidence of Blackden's unlawful conduct. He also had an objectively reasonable belief that such evidence could easily be destroyed if he did not seize it immediately. See generally United States v. Rivera, 825 F.2d 152, 156 (7th Cir. 1987) ("The government must show more than a subjective fear of imminent destruction of evidence; the fear must be objectively reasonable. In determining whether the agents reasonably feared imminent destruction of the evidence, the appropriate inquiry is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured.") (citations omitted). And, after seizing the camera, Trooper Decker properly (and promptly) sought a search warrant before examining the contents of the memory card.

18

In short, Trooper Decker's challenged conduct did not violate Blackden's Fourth Amendment rights.  See generally Illinois v. McArthur, 531 U.S. 326, 334 (2001) ("In various other circumstances, this Court has upheld temporary restraints where needed to preserve evidence until police could obtain a warrant. We have found no case in which this Court has held unlawful a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time.") (citations omitted).  See also Cupp v. Murphy, 412 U.S. 291, 296 (1973) (upholding limited warrantless search and seizure when officers had probable cause to arrest suspect, but did not actually arrest him at that time); Wayne R. LaFave, 3 Search and Seizure § 5.4(b), 195 (4th ed. 2004) ("At a minimum, Cupp should be applied so as to permit, when there are grounds upon which a formal arrest could have been made, a more extensive search for any evidence reasonably believed to be in the possession of the suspect which might be unavailable later, either because of future conduct of the suspect or by other means.").

III. First Amendment - Prior Restraint.

Next, plaintiffs assert that, as a result of Trooper Decker's seizure of Blackden's camera, plaintiffs were "prevented from publishing and or broadcasting his newsworthy pictures and

19

[have] thereby been prevented from exercising [their] First
Amendment rights to freedom of speech and the press."  Amended
Complaint at paras. 36-37.  They go on to claim that, "Decker's
seizure of Blackden's camera and digital memory card constituted
a prior restraint of (1) the publication of the images that were
on the card and (2) the taking and publication of any additional
'on the scene' images."  Plaintiffs' memorandum (document no. 45-
1) at 1.[2]


     The precise contours of the First Amendment claim plaintiffs
describe are not entirely clear.  Nevertheless, plaintiffs do
identify two opinions of the Court of Appeals for the First

---

          [2]     Despite plaintiffs' repeated use of the phrase "prior
restraint," this would not appear to be a case in which the facts
support such a claim.  See generally Alexander v. United States,
509 U.S. 544, 550 (1993) ("The term 'prior restraint' is used to
describe administrative and judicial orders forbidding certain
communications when issued in advance of the time that such
communications are to occur.") (citation and internal punctuation
omitted).  See also Id. at 566 (Kennedy, J., dissenting) ("In its
simple, most blatant form, a prior restraint is a law which
requires submission of speech to an official who may grant or
deny permission to utter or publish it based upon its contents.")
(emphasis supplied); Advocates for the Arts v. Thomson, 532 F.2d
792, 795 (1st Cir. 1976) ("The plaintiffs' reliance on the prior
restraint doctrine is, in our view, mistaken.  The premise of
that doctrine is that government has no power to restrict
expression because of its message, its ideas, its subject matter,
or its content, at least where the expression so restricted is
protected 'speech' within the First Amendment.") (citation and
internal punctuation omitted) (emphasis supplied).  Here, there
is no suggestion (or even an allegation) that Trooper Decker's
actions were in any way motivated by the content of Blackden's
speech (i.e., the subject matter of his photographs) and/or a
desire to suppress that speech.

Circuit which they say support their assertion that Trooper
Decker violated their constitutionally protected right of free
speech: Glik v. Cunniffe, 655 F.3d 78 (1st Cir. 2011) and
Iacobucci v. Boulter, 193 F.3d 14 (1st Cir. 1999).  Neither
supports their First Amendment claim.  To be sure, the Glik court
acknowledged the breadth of protections afforded by the First
Amendment:

> It is firmly established that the First Amendment's
> aegis extends further than the text's proscription on
> laws "abridging the freedom of speech, or of the
> press," and encompasses a range of conduct related to
> the gathering and dissemination of information.  As the
> Supreme Court has observed, "the First Amendment goes
> beyond protection of the press and the self-expression
> of individuals to prohibit government from limiting the
> stock of information from which members of the public
> may draw."

655 F.3d at 82 (citations omitted).  The court continued by
noting that, "An important corollary to this interest in
protecting the stock of public information is that there is an
undoubted right to gather news from any source by means within
the law."  Id. (emphasis supplied).


The highlighted language underscores an important fact that
readily distinguishes this case from those upon which plaintiffs
rely: Blackden was not acting within the law while taking the
photographs at issue.  To the contrary, Blackden was engaged in
criminal conduct.  He was within a restricted area without

21

authorization, dressed in a way that falsely conveyed that he was a member of one of the responding emergency crews, and he was operating a vehicle with flashing red emergency lights - all in violation of New Hampshire law.  Trooper Decker unquestionably had probable cause to believe that Blackden's conduct was unlawful, and Blackden unarguably could have been placed under arrest.  That was not the case in either Glik or Iacobucci. Indeed, in both cases the court explicitly noted that the arresting officers lacked probable cause to arrest the plaintiffs.  See Glik, 655 F.3d at 88; Iacobucci, 193 F.3d at 24.

Moreover, the plaintiffs in both Iacobucci and Glik were arrested for conduct which, under the circumstances, was protected by the First Amendment: Glik was arrested for publically videotaping police officers (without interfering) as they arrested a third party, while Iacobucci was arrested for disorderly conduct and disturbing a public assembly while videotaping a public meeting.  Here, however, Blackden was stopped and his camera seized based upon conduct unrelated to (or, at best, only indirectly related to) any constitutionally protected news-gathering efforts: impersonating emergency rescue personnel, unlawfully displaying red emergency lights on his vehicle, and illegally gaining access to a controlled emergency scene without proper authorization.

22

Finally, and perhaps most importantly, nothing in plaintiffs' complaint or their legal memoranda suggests that, by seizing Blackden's camera, Trooper Decker intended to suppress Blackden's constitutionally protected speech and/or retaliate against Blackden for his news-gathering activities. <u>See generally</u> <u>Tatro v. Kervin</u>, 41 F.3d 9, 18 (1st Cir. 1994) (noting that in a case involving claims that a police officer violated his First Amendment rights, the plaintiff must demonstrate that "the officer's intent or desire to curb the [plaintiff's] expression was the determining or motivating factor" for his actions, "in the sense that the officer would not have [taken those actions] 'but for' that determining factor."). <u>See also</u> <u>White v. Union Leader Corp.</u>, Civ. No. 00-122-B, 2001 WL 821530 at *3, 2001 DNH 127 (D.N.H. July 13, 2001) ("In order to prevail on her claims, [plaintiff] must establish that: (1) she had a First Amendment right; (2) defendants acted with the intent to prevent her from exercising that right; (3) defendants did, in fact, prevent or intimidate her from exercising that right; and (4) defendants acted under color of state law."). Blackden, of course, had no right to impersonate rescue personnel or access the scene in order to gather news.

On this record, it is plain that Trooper Decker lawfully seized Blackden's camera without a warrant as the exigent

23

circumstances made the seizure necessary to preserve potential evidence of criminal conduct.  The record does not support a claim that Trooper Decker seized the camera in an effort to suppress publication of content with which he disagreed, to hinder Blackden's First Amendment rights, or to retaliate against Blackden for having engaged in constitutionally protected conduct.

Stated simply, Blackden had no First Amendment right to unlawfully enter a controlled emergency scene - even if he intended to engage in conduct otherwise typically protected by the First Amendment.  And, Trooper Decker's temporary warrantless seizure of Blackden's camera as evidence of Blackden's unlawful conduct, pending prompt issuance of a search warrant, did not violate Blackden's constitutionally protected rights.[3]

---

[3]     While Trooper Decker certainly "seized" Blackden's camera and memory card, it is not appropriate to say, as plaintiffs allege, that he "retained" those items.  See, e.g., Amended Complaint at paras. 34, 41, and 42.  As noted above, Blackden's camera was returned to him almost immediately after it was seized.  While the memory card was not returned to Blackden for a longer period of time, it was not retained by Trooper Decker.  Rather, it was held "under the direction of the court" pursuant to state law, as evidence of Blackden's unlawful conduct.  See RSA 595-A:6.

IV.  <u>Qualified Immunity</u>.

Even if plaintiffs had evidence to support their claims that their First and/or Fourth Amendment rights had been violated, Trooper Decker would plainly be entitled to qualified immunity with regard to both causes of action.

Government officials are shielded from liability for civil damages unless their official conduct violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.  <u>See</u> <u>Reichle v. Howards</u>, 132 S. Ct. 2088, 2093 (2012).  To be "clearly established," a right "must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  <u>Id.</u>  <u>See</u> <u>also</u> <u>Brady v. Dill</u>, 187 F.3d 104, 116 (1st Cir. 1999) ("[T]he law must have defined the right in a quite specific manner, and the announcement of the rule establishing the right must have been unambiguous and widespread, such that the unlawfulness of particular conduct will be apparent <u>ex</u> <u>ante</u> to reasonable public officials.").

With regard to Fourth Amendment seizure claims, this court has previously observed that:

> When, as here, a seizure is challenged on grounds that
> the officers lacked reasonable suspicion (or probable
> cause), the qualified immunity inquiry does not require

25

the court to decide whether probable cause actually
existed, but rather, "whether a reasonable officer
could have believed that it did."  Put another way,
defendants are protected by qualified immunity "so long
as the presence of [probable cause] is at least
arguable."  Accordingly, for purposes of the qualified
immunity inquiry in this case, the dispositive question
is whether it was at least arguable that probable cause
existed to believe Manders engaged in disorderly
conduct within the meaning of [the New Hampshire
Criminal Code].

Byrnes v. City of Manchester, 848 F. Supp. 2d 146, 156 (D.N.H.

2012) (quoting Eldredge v. Town of Falmouth, 662 F.3d 100, 106

(1st Cir. 2011)).  See also Cox v. Hainey, 391 F.3d 25, 31 (1st

Cir. 2004) ("Qualified immunity, however, requires a somewhat

lesser showing. . . . Thus, in the case of a warrantless arrest,

if the presence of probable cause is arguable or subject to

legitimate question, qualified immunity will attach.").  Here,

the existence of probable cause is not just "arguable" or

"subject to legitimate question."  Probable cause plainly existed

to believe that Blackden had violated a variety of New Hampshire

laws and, absent seizure of his camera, evidence of Blackden's

unlawful conduct could well be destroyed.


    Similarly, even if plaintiffs had plausibly alleged that

Trooper Decker acted with an intent to suppress and/or retaliate

against Blackden's exercise of his right to free speech, and even

if one might conclude that Trooper Decker somehow violated

plaintiffs' First Amendment rights by seizing the camera in order

to preserve evidence of Blackden's unlawful conduct, still, Trooper Decker would be entitled to the protections afforded by qualified immunity.  See generally Reichle, 132 S.Ct. at 2094 (noting that the Court has never recognized a "specific right to be free from a retaliatory arrest that is otherwise supported by probable cause").  Plaintiffs have pointed to no precedent suggesting that, in August of 2010, it was clearly established that a warrantless seizure of evidence, supported by probable cause and subject to the exigent circumstances exception to the warrant requirement, may nevertheless give rise to a viable First Amendment retaliation claim.  Having failed to do so, their assertion that Trooper Decker is not entitled to qualified immunity is without merit.  See, e.g., Rivera-Corraliza v. Morales, 794 F.3d 208, 214-15 (1st Cir. 2015) ("The clearly-established step requires plaintiffs to identify controlling authority or a robust consensus of persuasive authority such that any reasonable official in the defendant's position would have known that the challenged conduct is illegal in the particular circumstances that he or she faced - then-existing precedent, in other words, must have placed the statutory or constitutional question beyond debate.") (citations and internal punctuation omitted).

### Conclusion

For the foregoing reasons, Belsito Communications lacks standing to pursue First and Fourth Amendment claims arising out of Trooper Decker's seizure of Blackden's camera. But, even if it did have standing, it is clear that Trooper Decker's conduct did not violate Belsito's or Blackden's constitutional rights. His seizure of Blackden's camera was supported by probable cause and fell comfortably within the "exigent circumstances" exception to the warrant requirement. And, contrary to plaintiffs' assertion, that seizure did not constitute an unconstitutional "prior restraint" on their ability to publish the accident scene photographs unlawfully taken by Blackden.

Finally, even if plaintiffs could have established that Trooper Decker actually violated their First and/or Fourth Amendment rights, he would still be entitled to the protections afforded by qualified immunity. Accordingly, defendant's motion for summary judgment (document no. 44) is granted.

The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

Steven J. McAuliffe
United States District Judge

January 12, 2016

cc:  Kevin D. Bloom, Esq.
     Robert N. Isseks, Esq.
     Penny S. Dean, Esq.
     Rebecca W. Ross, Esq.
     Matthew T. Broadhead, Esq.